# United States Court of Appeals
## For the First Circuit

No. 03-2543

UNITED STATES OF AMERICA,

Appellee,

v.

KENYA TEEMER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Schwarzer,* Senior District Judge.

Brett D. Baber, by appointment of the court, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

January 12, 2005

---

*Of the Northern District of California, sitting by designation.

**BOUDIN**, **Chief Judge**. On the afternoon of October 29, 2003, in Portland, Maine, police officer Gayle Petty pulled over a Mitsubishi hatchback driven by Jason Stubbs. Stubbs' girlfriend, Amanda Bailey, was sitting in the passenger seat. Kenya Teemer was sitting in the rear seat immediately behind her. Behind him was the hatchback's storage area, which arguably could be accessed by reaching over the rear seats or by folding down either or both of them.

Petty, who had halted Stubbs for running a stop sign, took Stubbs' license and found from a radio call that the license was no longer valid. After the arrival of a second officer (Robert Hawkins), Petty arrested Stubbs for driving with a suspended license and put him in her cruiser. At that point, Stubbs told Petty that he had a gun in the trunk and ammunition in the glove compartment.

Apparently at the same time, Hawkins asked Bailey and Teemer to step out of the hatchback "so I can talk to you for a few minutes, please." Asked whether either had a license (and therefore could drive the car away), Bailey produced a permit, but Teemer had no identification. Questioned about this, Teemer gave his name and birth date and admitted (when asked) that he was on probation in Georgia. Hawkins then contacted his dispatcher about Teemer's probation status.

In the meantime, Petty searched the car, finding an unloaded AK-47 (a well-known brand of assault rifle) lying flat in the storage area, a few inches behind the rear seats. Ammunition was also found scattered about and in a bag in the back, but it was for a different weapon; in the glove compartment were two loaded magazines with ammunition for the AK-47. Hawkins then radioed for a supervisor and, in due course, Sergeant Cady arrived.

Cady asked Teemer about his probation status and the gun in the car, and Teemer said that Stubbs owned the gun. Cady then asked Teemer "if his [Teemer's] fingerprints would be found on the weapon." According to Cady, Teemer answered that "they definitely would be[,] because he had moved this weapon in Westbrook a few days earlier"; Hawkins later testified that he overheard Teemer saying that "he had touched it a few days prior at a friend's house and it was the seat [sic], and that he had just picked it up to move it so he could watch a football game."

Cady then called the dispatcher to see whether Teemer's probation status had yet been clarified and was told that he did have a felony conviction. Cady testified later that this information, coupled with Cady's own observation of the rear seats and the storage area, persuaded him that a case for constructive possession could be made against Teemer as a felon in possession. He therefore ordered Teemer's arrest.

Prior to trial, the district court granted a motion to suppress statements that Teemer had made at the station house after his arrest, ruling that they were made after Teemer had expressed his desire to remain silent. The district court refused to suppress Teemer's admission made at the scene of the car stop; the court held that no Miranda warning had been required at the scene because Teemer had not been subject to custodial interrogation.

About three weeks before trial, Teemer's counsel sought to withdraw. The district judge questioned both Teemer and his counsel, who had by then represented Teemer for six months. Based on the answers given, the district court ruled that no adequate basis existed to replace counsel and delay the trial; the court noted that the trial counsel had provided "diligent" and "zealous" representation (by then, counsel had partially won the motion to suppress).

At trial, the government relied mainly on Teemer's admission and on his proximity to the weapon in the car. Stubbs testified that he had bought the AK-47 and had recently stored it in the car and in Bailey's apartment in Westbrook, Maine, in which he and Teemer were staying. He also testified that he himself sometimes carried the weapon in a box and sometimes not, and that reaching over the rear seats to access the gun in the back was impractical because of other items in the storage area.

Bailey also testified at trial. From the combination of her trial and grand jury testimony, the jury could have found that Stubbs and Teemer had gone target-shooting with the AK-47 on two occasions (although Bailey did not see what role Teemer played) and that, on one occasion, Teemer had carried the gun into the house. However, her statements at trial were not wholly consistent with her grand jury testimony.[1]

At the jury-instruction stage, Teemer sought an instruction entitled "Transitory Possession as a Defense" stating:

> Evidence may be presented to you regarding transitory possession. The evidence may tend to show that the Defendant was touching the firearm merely to move it out of his way. You are instructed that if a person has possession of a firearm under certain circumstances which indicate that he did not have the intent to do the acts which constitute the possession of a firearm, that person would not be guilty of the offense charged. If the actual possession of the firearm by the Defendant was fleeting without the intent to exercise control, then this defense is applicable. This defense is based upon the definitions of actual and constructive possession, which I gave you earlier. If you find beyond a reasonable doubt that the Defendant did not have the specific intent to have a possessory interest in the firearm and that he did have a "transitory" possession of the firearm, then you must find him not guilty.

---

[1]Bailey's trial testimony was more qualified and less helpful to the government than her grand jury testimony; for example, she said at trial that she had seen Teemer carrying the box rather than the gun. But her grand jury testimony was read to her at the trial and, under the hearsay exception associated with the De Sisto case, was admissible for its truth. Fed. R. Evid. 801(d)(1)(A); United States v. De Sisto, 329 F.2d 929, 933 (2d Cir. 1964) (Friendly, J.).

The district court declined to give this instruction, providing instead a standard instruction on "possession" which we reprint in full in an attachment. The key language, following a statement that possession must be done "voluntarily and intentionally, and not because of any mistake or accident," was as follows:

> And I instruct you that the term possess means to exercise authority, dominion, or control over something. It is not necessarily the same as legal ownership. The law recognizes different kinds of possession. Possession includes both actual and constructive possession. A person who has direct physical control of an object on or around his or her person is then said to be in actual possession of it.

> And I instruct you that a person who is not in actual possession, but who has both the power and the intention to exercise control over something or an object is in constructive possession of it.

The jury convicted Teemer, who was then sentenced--at the top of the guideline range--to 41 months' imprisonment. He has now appealed, claiming that his admission should have been suppressed, that the subsequent motion to replace his counsel was improperly denied, and that his proposed instruction on "transitory" possession should have been given. The last is the most difficult issue and we begin with it, simplifying matters by assuming that review is de novo.[2]

_____

[2]Whether an instruction should have been given can involve abstract questions of law reviewed de novo, United States v.

From the evidence, the jury had several different paths that it could have taken to its conclusion that Teemer had possessed the AK-47: importantly, his own admission that he had moved the weapon in the apartment so he could sit down, his proximity to it during the final car ride, a conclusion or inference (from Bailey's testimony) that Teemer had carried it into the apartment, and (perhaps) an inference that he had handled or used it on an outing with Stubbs (again, Bailey's testimony).

Any one of these theories, except perhaps the last, would be independently adequate; but the second (proximity in the car) turned in part on ease of access, where the testimony was disputed, and required an additional inference of intent; and the third depended <u>inter alia</u> on Bailey's debatable credibility. So the jury may well have relied upon the first theory (Teemer's admission), and if there were error in refusing to give the proposed instruction, we would not accept the government's suggestion that it was harmless. <u>See</u> <u>Chapman</u> v. <u>California</u>, 386 U.S. 18, 24 (1967); <u>see also</u> <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 15-16 (1999).

The district court did instruct that intent is necessary to possession, and that the requisite intent is to exercise authority, dominion, or control. So, the real bite of the proposed instruction is its creation of a "defense" that would require the

<u>Woodward</u>, 149 F.3d 46, 68-69 (1st Cir. 1998), and questions of phrasing and emphasis that are very much judgment calls to be reviewed with deference, <u>id.</u>

-7-

jury to acquit if it found that the defendant's possession was "fleeting" or "transitory" and that he did not intend in some more permanent sense to retain authority over the weapon. This does arguably fit Teemer's case and would have gone some distance to negate the adverse impact of his admission.

The district court was correct not to give this proposed instruction. It could easily exculpate a bank robber who, after the robbery and on request, picked up another bank robber's gun from the table and handed it to him. There are plenty of other situations in which holding a weapon, even briefly and without an intent to retain it, would nonetheless be unacceptable for a former felon. Indeed, a number of our cases say, in the context of both guns and drugs, that the briefest moment of possession may be enough for a conviction.[3]

This does not mean that brevity or any other circumstance must be ignored by a jury in gauging whether intentional possession occurred--merely that brevity alone does not preclude conviction. Teemer's approach, by contrast, aims to make brevity controlling, at least where the defendant does not intend to keep the weapon permanently. Because his proposed instruction was overbroad, and

---

[3]See, e.g., United States v. Escobar-De Jesus, 187 F.3d 148, 176 (1st Cir. 1999) (guns); United States v. Zavala-Maldonado, 23 F.3d 4, 8 (1st Cir. 1994) (drugs); Santiago v. United States, 889 F.2d 371, 376 (1st Cir. 1989) (drugs).

therefore incorrect, we could end our inquiry there.  See United States v. Meade, 110 F.3d 190, 202-03 & n.22 (1st Cir. 1997).

But if the conduct to which Teemer confessed were clearly not a crime, we would be very uncomfortable letting matters stand. The underlying problem of allegedly innocent possession recurs intermittently in a variety of forms.  See, e.g., United States v. Kitchen, 57 F.3d 516, 521-25 (7th Cir. 1995); United States v. Mason, 233 F.3d 619, 622-24 (D.C. Cir. 2000).  Indeed, one other circuit (in Mason) has crafted a defense conditioned on possession that is both "innocent" and "transitory."  233 F.3d at 624.  Thus, more needs to be said about Teemer's theory than merely to point out the overbreadth of his own proposal.

With this statute, as with many others, there are circumstances that arguably come within the letter of the law but in which conviction would be unjust--arguably so in some cases, and clearly so in others.  Consider if a schoolboy came home with a loaded gun and his ex-felon father took it from him, put it in drawer, and called the police; or if a mother--who need not be a felon to be charged with drug possession--threw into the trash an envelope of marijuana found in her daughter's bureau drawer.

The common law has created, and federal criminal law has absorbed, "justification" defenses of necessity and duress, see Mason, 233 F.3d at 622-23 (citing cases), but neither defense would encompass the mother, and the father might well have problems with

the necessity defense, especially if the facts were slightly less menacing. Most prosecutors and--failing that--most juries would show good sense in such situations. But sometimes both safeguards fail. No legislature can draft a generally framed statute that anticipates every untoward application and plausible exception.

Judges may and often do fill such gaps with glosses and limitations conveyed in jury instructions, but every such gloss imports potential problems of its own. We have already pointed out how easily Teemer's proposed instruction could be misused; and in an earlier case, this court rejected a general "good purpose" defense advanced by an ex-felon (there, the felon had taken a gun from a friend, allegedly to prevent a suicide, but had then stored the weapon for several weeks). Meade, 110 F.3d at 201-03.

Even the defense adopted in Mason, combining requirements of innocent acquisition and brevity of retention, could be misused. It could be read to apply, for example, if Stubbs asked Teemer to hold the gun for just a moment while Stubbs changed a target, during an expedition to try out the weapon. If a jury wished to acquit in such a situation, it could do so; but why should it be told that it had to?

Neither the language of the felon-in-possession statute, nor its evident purpose, encourage the court to develop defenses that leave much room for benign transitory possession. The statute bans possession outright without regard to how great a danger

exists of misuse in the particular case. Indeed, one piece of legislative history of an ancestor statute says that the aim was "to prevent the crook and gangster, racketeer and fugitive from justice from being able to purchase or in any way come in contact with firearms of any kind."[4]

In this case, the instruction did not say that merely to touch the AK-47 constituted a crime. The instruction said that "possession" required the defendant to "exercise authority, dominion, or control"--giving the jury latitude to employ its judgment and to conclude that moving the weapon did not constitute possession. The closing argument for the defense pressed just such an argument, but the conviction is no surprise: riding around in a car with an AK-47 is a risky business for an ex-felon.

By contrast, in Mason, the district judge had affirmatively instructed the jury that "[w]ell meaning possession" was not a defense, even though the defendant's story was that he had found the gun in a bag near a school, taken it to protect the children, and planned to deliver it to the police. One can understand why the D.C. Circuit was unhappy, even though its

---

[4]Barrett v. United States, 423 U.S. 212, 220 (1976) (quoting S. Rep. No. 75-1189 at 33 (1937), expressing the intent of 1938 federal gun control law banning "receipt" of a firearm). The successor 1968 statute, which "enlarged and extended" the earlier law's scope to include "possession," aimed at "keeping firearms out of the hands of . . . felons." Id.

-11-

preferred solution (framing a general exception instead of just reversing the instruction given) is not our own.

Relying upon the jury is reasonable, for common sense is the touchstone in situations of innocent contact, and the occasions that might warrant leniency are myriad and hard to cabin in advance. Assuming that Teemer moved the gun to sit down and did nothing else (i.e., had never carried it into the house or ridden with it deliberately in reach), we think that the jury was still entitled--but not required--to conclude that he had broken the law. If we were to craft a mandatory safe harbor, it would not include this case.

No record exists in this circuit of abusive indictments for innocent contact, let alone convictions, that would warrant an effort to craft a general limitation. And, so long as judges leave juries the kind of latitude that the trial judge sensibly did in this case, it is unlikely that juries will be foolish enough to convict in cases like the schoolboy or bureau-drawer incidents set forth above. If the worst happens, the courts are competent to deal with such cases individually or in gross when they arrive.

Less need be said about the motion to exclude Teemer's admission at the scene of the car stop. Teemer's position has been that Cady extracted the admission through "custodial interrogation," without giving Teemer a Miranda warning of his right to remain silent and his right to counsel. See United States

-12-

v. <u>Ventura</u>, 85 F.3d 708, 710 (1st Cir. 1996). The district judge wrote a thoughtful opinion making findings and concluding that the admission at the scene should not be suppressed.

Factual findings in such a situation are reviewed for clear error. A district judge's application of a legal label to the unique facts would ordinarily be reviewed with some deference, <u>see</u> <u>In re Special Proceedings</u>, 373 F.3d 37, 42 (1st Cir. 2004); <u>Bergersen</u> v. <u>C.I.R.</u>, 109 F.3d 56, 61 (1st Cir. 1997); but in this kind of case, the Supreme Court has arguably instructed that the ultimate conclusion be reviewed <u>de novo</u>. <u>See</u> <u>United States</u> v. <u>Fernandez-Ventura</u>, 132 F.3d 844, 846 (1st Cir. 1998) (citing <u>Thompson</u> v. <u>Keohane</u>, 516 U.S. 99, 101-02, 114-16 (1995)). We do so here, but affirm the district court's ruling.

The label "custodial interrogation," like many such labels (including "possession"), is suggestive rather than precise; and the purpose as well as the words inform our understanding. The <u>Miranda</u> doctrine functionally aims to protect defendants in situations where, in common experience, isolation and the potential for coercive pressure have been found to exist. <u>New York</u> v. <u>Quarles</u>, 467 U.S. 649, 654 (1984). The fearsome squad room interview of an arrestee is the classic case.

Once a formal arrest occurs, <u>Miranda</u> ordinarily comes into play. <u>Stansbury</u> v. <u>California</u>, 511 U.S. 318, 322 (1994). Where there has been no formal arrest, this court and others have

considered a range of factors including (without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation. United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999). Even pre-arrest questioning at a police station is not automatically deemed custodial. California v. Beheler, 463 U.S. 1121, 1125 (1983).

Although any restriction on movement might as a literal matter be labeled "custodial," the Supreme Court has flatly rejected such an approach, holding that someone questioned at a routine traffic stop in a non-coercive setting need not be given the Miranda warning. Berkemer v. McCarty, 468 U.S. 420, 437-40 (1984). In fact, Terry stops, which may be made on reasonable suspicion rather than probable cause, tend not to be treated as custodial unless they become unduly prolonged or especially restrictive. 33 Geo. L.J. Ann. Rev. Crim. Proc. 155-58 & nn.526-28, 530 (2004) (collecting cases).

In the present case, both the circumstances and the officers' testimony suggest that Teemer, although not told to remain, would not have been allowed to leave the scene once suspicion began to envelop him. But he was not handcuffed, placed in the police car, or subject to direct physical constraint beyond being asked not to approach or to communicate with Stubbs after the

latter's arrest.  Teemer and Bailey stood around in the vicinity of the officers, but not under close guard or direct restraint.

The entire sequence, from car stop to Teemer's arrest, took slightly over 30 minutes.  This is longer than most traffic stops, but well within the period in which Terry stops have been treated as valid and not de facto arrests.  See United States v. Owens, 167 F.3d 739, 748-49 (1st Cir. 1999); United States v. McCarthy, 77 F.3d 522, 530-31 (1st Cir. 1996) (citing cases).  Nor was Teemer subject to systematic interrogation: he was asked a number of questions at different times on different subjects (license, probation, the weapon) as the police continued to assess his status.

We agree with Teemer's claim that a reasonable person in his position would not have thought himself free to walk away; and, certainly, once the weapon was discovered, something more than a routine traffic stop was in progress.  But on the broad spectrum from a speeding ticket to a grilling in the squad room, the events here were in the Terry stop range and short of any de facto arrest or custodial interrogation; given this, and that the circumstances were not inherently coercive, no Miranda warning was required.

Teemer's final claim--that his motion to replace trial counsel should have been granted--is without merit.  Nicholas Mahoney was appointed as Teemer's attorney on November 1, 2002; at Teemer's request, Mahoney filed a motion to withdraw on May 14,

-15-

2003, a week after the trial list had set June 2, 2003, as the date for trial. The district court held an immediate hearing, conducting it ex parte with the government's consent.

In this meeting, Teemer aired a number of grievances about his attorney's performance, and the judge considered Mahoney's explanations for his actions. It is enough to say here that Mahoney amply justified his actions, and nothing deserving any serious criticism emerged. The district judge did more than enough to discharge his duty to explore the situation. See United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986); see also United States v. Myers, 294 F.3d 203, 207 (1st Cir. 2002).

Having questioned both Teemer and his attorney, the district judge found no irrevocable breakdown in communications between them, see Myers, 294 F.3d at 208, nor any other cause to replace the attorney. These are judgment calls that mingle factual findings and law application; they are reviewed with deference to the district judge's on-the-scene assessment, see id. at 206-07; and nothing in this case remotely suggests that the trial judge erred.

A defendant has no automatic right to replace counsel and, as trial approaches, the balance of considerations shifts ever more toward maintaining existing counsel and the trial schedule. United States v. Richardson, 894 F.2d 492, 496 (1st Cir. 1990). On appeal, Teemer's new counsel says that pro se representation should

-16-

have been explored; but unlike in _Proctor_, no such request was made.  _United States_ v. _Proctor_, 166 F.3d 396, 397, 401-02 (1st Cir. 1999).

_Affirmed_.

APPENDIX

Now I instruct you that the word knowingly as it is used in the indictment means that the act was done voluntarily and intentionally, and not because of any mistake or accident.

And I instruct you that the term possess means to exercise authority, dominion, or control over something. It is not necessarily the same as legal ownership. The law recognizes different kinds of possession. Possession includes both actual and constructive possession. A person who has direct physical control of an object on or around his or her person is then said to be in actual possession of it.

And I instruct you that a person who is not in actual possession, but who has both the power and the intention to exercise control over something or an object is in constructive possession of it.

Whenever I use the term possession in these instructions, I mean actual as well as constructive possession. I instruct you that possession also includes both sole, that is singular, and joint possession. If one person alone has actual or constructive possession, the possession is sole. If two or more persons share actual or constructive possession, possession is joint.

Whenever I have used the word possession in these instructions, I mean joint as well as sole possession. Now you may find that the element of possession as that term is used in these

-18-

instructions is present. If you find beyond a reasonable doubt that the defendant had actual or constructive possession, either alone or jointly with others, the government I instruct you need not prove possession by direct evidence. The government may instead rely on the totality of the circumstances presented by the evidence in this case.

If reason and common sense leads you to draw the inference from the facts established that the defendant possessed the firearm, you may draw such an inference, it's for you to decide. You are, however, the sole judges of the facts and of the inferences if any to be drawn from them, and I remind you of that.

An act is done knowingly if it is done voluntarily and intentionally and not because of a mistake or accident or some other innocent reason. The purpose of adding the word knowingly in the indictment and in the statute under which the indictment is returned is to insure that no one will be convicted for an act done because of a mistake or an accident or for any other innocent reason.